IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KIMBERLY J. LAVASSEUR,

                        Plaintiff,                             OPINION AND ORDER

     v.

                                                    24-cv-872-wmc

COUNTY OF ASHLAND,
DAN GRADY and
BRIAN ZUPKE,

                        Defendants.

---

      Plaintiff Kimberly J. Lavasseur filed this civil action under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the First and Fourteenth Amendments, claiming that her former employer, Ashland County, and her supervisors, defendants County Administrator Dan Grady and Sheriff Brian Zupke, unlawfully terminated her employment as jail administrator.  Specifically, plaintiff, who is white, alleges discrimination on the basis of race, sex, age and national origin, as well as retaliation in response to her protected speech and violations of her due process rights.[1]

---

[1] Approximately one month before dispositive motions were due, plaintiff filed a motion for leave to amend her complaint to add due process claims.  (Dkt. #28.)  Defendants opposed the motion on the grounds that it was untimely, and the claims would be barred by the statute of limitations.  (Dkt. #31.)  However, plaintiff's motion for leave to amend her complaint was unnecessary because, as defendants concede in their opposition brief (dkt. #31, at 2–3), she included allegations supporting a due process claim in her original complaint.  (Dkt. #1, ¶¶ 1,2, 86–91.)  These included claims that she was deprived of her "Due Process rights under the Fourteenth Amendment" (*id.* ¶ 1), and more specifically, that defendant "Grady interfere[d] with Plaintiff's exercise of her due process rights."  (*Id.*, § II.1.)  Moreover, under federal notice pleading standards and well-established Seventh Circuit law, "a complaint need not plead legal theories, which can be learned during discovery," *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011), and a defendant is not entitled to rely on a list of legal theories in the complaint.  *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.,* 900 F.3d 529, 540–41 (7th Cir. 2018); *Frank v. Walker,* 819 F.3d 384, 387–88 (7th Cir. 2016*); Rabe v. United Air Lines, Inc.,* 636 F.3d 866, 872 (7th Cir. 2011).  If a defendant wants

The parties have filed cross-motions for summary judgment. (Dkts. ##36, 38.) Defendants move for summary judgment on plaintiff's discrimination and retaliation claims, and plaintiff moves for summary judgment on all claims, including her due process claims. Because there are genuine disputes of material facts as to all of plaintiff's claims as discussed below, both motions for summary judgment will be denied.

## UNDISPUTED FACTS[2]

### A. The Parties

Plaintiff Kimberly J. Lavasseur began working for Ashland County Sheriff's Office as a correctional officer in 2001. In 2021, she applied for and was promoted to Administrator of the Ashland County jail by Sheriff Michael Brennan and Chief Deputy Brian Zupke. As jail administrator, Lavasseur was a salaried employee and did not work regular hours or use a time keeping system to record when she was on duty. Lavasseur is

---

confirmation on the legal theories a plaintiff is asserting, the proper course of action is to serve contention interrogatories. *Joseph v. Elan Motorsports Technologies Racing Corp.*, 638 F.3d 555, 561 (7th Cir. 2011). Thus, under circuit law, no formal amendment is required to allow plaintiff to assert her due process claims against defendants. For the sake of clarity, however, the court will allow plaintiff to make the amendment. *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) ("For clarification and to ward off further insistence on a punctiliously stated 'theory of the pleadings,' petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to [the new legal theory]."). Further, defendants need not file an answer, as all of plaintiff's articulated due process claims will be deemed denied and are addressed in this opinion.

[2] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.

a white woman of Scottish and Polish descent and was approximately 53 years-old at the time she was terminated from the jail administrator position in January 2023.

As chief deputy, defendant Zupke's primary duties were budgeting and supervising dispatch and patrol, as well as the Ashland County jail.  However, once Lavasseur was appointed as jail administrator, she became primarily responsible for managing the jail. Zupke identifies as white, Hispanic and Native American and is a member of the Bad River Band.

Finally, defendant Grady has been the County Administrator for Ashland County since September 2021.  As county administrator, Grady reports to the Ashland County Board and supervises department head appointments by the board or a commission. However, Grady does not supervise elected officials, such as the sheriff.

**B.  Lavasseur's Attendance at County Board Meetings and Budget Concerns**

In August of 2021, after her promotion to jail administrator, Lavasseur began attending meetings of the Ashland County Board, along with some of its subcommittees. During certain of these meetings, she would appear on agendas as a speaker, and at other times she spoke during the meetings' public comment periods.  Among other things, Lavasseur would provide updates on the jail, speak about covid-related issues and budget concerns in the jail, comment on combining county dispatch services with Bayfield County, and advocate pay raises for corrections staff, kitchen staff and dispatchers.  Some county meetings were held during business hours, while one subcommittee in particular, the Public Property Law Enforcement Committee ("PPLE"), met in the evening.  At times, board

members would also call Lavasseur outside of meetings to ask questions about her opinions on county operations.

County Administrator Grady believed that County Board members were annoyed and bored by Lavasseur's frequent attendance at meetings, because she used public comment time to speak repeatedly about jail issues without regard to whether those issues were on that meeting's agenda. Grady also thought she was a distraction and should be spending time working at the jail and otherwise performing her job as jail administrator, not attending board meetings. Sometime in 2022, Grady formally told Lavasseur to stop attending board meetings while on duty because it was not part of her job. (Grady dep. (dkt. #32-1) 180.) Grady later advised Lavasseur that she was turning the board off and should stop attending board meetings altogether. Grady also shared his concerns with then sheriff, Michael Brennan, telling him, "You need to call off your dog." In response, Brennan observed that Lavasseur was his employee to direct as he saw fit. Sometime later, Grady also requested that Chief Deputy Zupke order Lavasseur not to attend County Board meetings.

As jail administrator, Lavasseur had a primary role in proposing a budget for the jail. In late 2022, she approached Sheriff Brennan with concerns about the budget proposed by County Administrator Grady. In particular, she reported to Brennan and then Grady that some of the Sheriff Department's needs were not included in Grady's budget, including a budget for dispatch. Lavasseur further told Grady that the budget Chief Deputy Zupke had prepared for the sheriff's dispatch division was "wrong." After hearing nothing from Grady, she reported her budget concerns to the county's outside auditor.

## C. Inmate Sexual Assault Investigation

In September 2022, an inmate in the Ashland County Jail reported possible sexual misconduct between two other inmates. A jail sergeant privately questioned one of the inmates on several occasions, but the inmate denied any inappropriate conduct or that threats or force was involved. The sergeant also consulted Lavasseur, and they both concluded that no further action was warranted.

In October 2022, however, one of the same two accused inmates passed a handwritten letter to jail staff, advising that he had been sexually assaulted. Lavasseur was notified of the letter that same day and contacted the jail control pod. She informed Sheriff Brennan of the complaint the next morning. Lavasseur then contacted several outside agencies and asked them to investigate the incident, but they all declined. At that point, Lavasseur assigned the matter internally to a county detective to investigate, with permission from the District Attorney's Office.[3] According to Lavasseur, she also informed Chief Deputy Zupke of the sexual assault allegations and ongoing investigation sometime in October or early November 2022. Zupke disputes this, stating that he first learned of the sexual assault investigation around November 29, 2022, from a different employee.

## D. Decision to Demote and Terminate Lavasseur

As of 2022, Brennan had been county sheriff for 12 years but decided not to seek reelection. Instead, Chief Deputy Zupke ran for office and was elected sheriff in November

---

[3] The district attorney's office ultimately declined to bring any charges arising out of this alleged sexual assault.

2022.  On December 12, 2022, before Sheriff Brennan left office, he presented Lavasseur a letter of formal appreciation, stating that she had "successfully" led the jail through a difficult time and that the jail had seen "many improvements and positive changes" under her leadership.  (Letter of Appreciation (dkt. #32-4).)  Around the same time, however, County Administer Grady learned of the sexual assault investigation at the jail.  This prompted Grady, Zupke and the county's corporation counsel, Max Lindsey, to begin investigating Lavasseur's role in that investigation.  Then still Sheriff Brennan was not informed of this independent investigation of Lavasseur.  Further, neither Zupke, Grady or Lindsey spoke with Lavasseur as part of their investigation; nor did Grady or Zupke consult the jail policy manual or conduct their own investigation.  Instead, they relied on Lindsey as corporate counsel to handle the legal niceties of their collective investigation.  At summary judgment, the record contains no details about what comprised this "investigation."

Nonetheless, after Zupke took office as the new sheriff on January 3, 2023, Grady recommended he terminate Lavasseur, purportedly based on her failure to investigate the sexual assault allegation more promptly.  Zupke thought that she should be demoted instead.  On January 16, 2023, three days before any formal decision about Jail Administrator Lavasseur's position was made, Sheriff Zupke emailed Lavasseur that: "Nobody can attend [board meetings] on duty nor speak on behalf of the sheriff's office. I will handle all that....Any concerns or budget requests can be voiced through me."  (Dkt. #44-10.)   Then, on January 19, Corporation Counsel Lindsey delivered a letter to Lavasseur, notifying her that she had been demoted from jail administrator to corrections

6

officer. (Dkt. #32-5.) That letter provided no basis for the demotion, but stated that Lavasseur should meet with Sheriff Zupke as soon as possible. (*Id.*)

That same day, Sheriff Zupke called Lavasseur into a meeting with Kyle Cadotte, a detective with Ashland County, and himself. Days earlier, unbeknownst to Lavasseur, Zupke had purportedly already told Cadotte, his wife's cousin, that Cadotte would replace her as the jail administrator. Zupke did offer Lavasseur a correctional officer position, but according to Lavasseur, her reaction was complete and utter shock, and she left the meeting without accepting the position or resigning. Sheriff Zupke also secretly recorded the meeting without telling Lavasseur.

On January 30, Lindsey provided Lavasseur a separate letter notifying her that she had been terminated. (Dkt. #37-3.) The letter provided no reason for the termination. Lavasseur asked Lindsey why the County terminated her, and Lindsey replied, "I don't know," directing her to contact Zupke or Grady.[4]

### E. Grievance Proceedings

Lavasseur's termination letter informed her that she had the right to a grievance hearing, which she pursued. After the hearing examiner upheld Lavasseur's termination, she then appealed that decision to the full 21-member County Board. Before that hearing, which was held from May 9 to 12, 2023, County Administrator Grady had private, in-

---

[4] The parties dispute whether Sheriff Zupke or County Administrator Grady had the authority to demote and terminate Lavasseur. (*See* Def's. Resp. to Pl's. PFOF (dkt. #50) ¶¶ 16, 19.) The undisputed facts confirm that both Zupke and Grady were involved in the decision to demote and then fire Lavasseur. (Zupke dep. (dkt. #32-2, at 40; Grady dep. (dkt. #32-1), at 89–90.)

person conversations with multiple members of the board, including the chairman.  Grady also played the surreptitiously recorded conversation between Sheriff Zupke and Lavasseur taken during her "demotion" meeting to at least one of the board members.

The County Board initially tied when voting whether to uphold Lavasseur's termination, which meant that Lavasseur had prevailed under the Board's rules.  However, at that point, a recess was taken, during which Grady spoke with some of the board members.  After reconvening, the Board then voted to reconsider its initial decision and a final vote reversed the outcome.  In particular, twelve members voted to uphold the termination, eight voted to reverse the termination, and one member abstained.  Accordingly, the County Board accepted the hearing examiner's decision and established Lavasseur's termination date effective as of January 20, 2023.

### F.  Lavasseur's Replacements

As Zupke had planned, Lavasseur's initial replacement as interim jail administrator was Kyle Cadotte, a younger man of Native American descent.[5]  Cadotte had no prior experience in the jail and was not required to apply for the position.  According to defendants, Cadotte's appointment was temporary, though County Administrator Grady admits that if Cadotte had performed well, he would have asked him to apply for the permanent position.  (Grady dep. (dkt. #32-1) 222.)  Grady also notified county court staff on January 23 via email that "Kyle Cadotte is replacing Kim Lavasseur as Jail

---

[5] Neither party provides Cadotte's exact age at the time of his appointment, nor the date of his resignation.

8

Administrator" effective January19.  (Dkt. #44-11.)  That same day, Grady asked Cadotte to attend the next PPLE Committee meeting to introduce himself.

Approximately eight days after Cadotte took over as jail administrator, an inmate in the jail died of a drug overdose.  Ashland County did not initiate an internal investigation into that death.  Cadotte eventually resigned as jail administrator after he was placed on administrative leave for his involvement in a hit-and-run incident in a neighboring county.  Sheriff Zupke next promoted Jennifer Clapero, another Sheriff's Office employee, to be the jail administrator.  Clapero was a 46 year-old woman at the time and was having an extramarital affair with Zupke.  Clapero skipped past the sergeant rank when she was promoted, but she had previous experience working as a jail sergeant in another county.

OPINION

Summary judgment will be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  That standard does not change when determining cross-motions for summary judgment, *Calumet River Fleeting, Inc. v. International Union of Operating Engineers, Local 150, AFL-CIO*, 824 F.3d 645, 647–48 (7th Cir. 2017), although the court must "construe all facts and inferences" in favor of the non-moving party in turn.  *Id*.

## I.      Discrimination Claims

Plaintiff brings discrimination claims under Title VII, the ADEA and the Equal Protection Clause of the Fourteenth Amendment, contending that defendants demoted,

9

then terminated her employment because of her sex, age, race and national origin. The framework for analyzing plaintiff's various discrimination claims is similar. *Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025). In the Seventh Circuit, a plaintiff has two ways to survive summary judgment on an unlawful employment discrimination claim. *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). First, the plaintiff may show that the totality of the "evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (2016); *Groves v. South Bend Cmty. Sch. Corp.*, 51 F.4th 766, 769–70 (7th Cir. 2022). Second, the plaintiff may establish discrimination through the *McDonnell Douglas* burden-shifting framework, where the plaintiff must first show: "(1) she is a member of a protected class, (2) that she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (2016); *see McDonnell Douglas v. Green*, 411 U.S. 792 (1973). If the plaintiff demonstrates a prima facie case under the *McDonnell Douglas* framework by establishing the first four elements, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the employment action." *Id*. (citing *Andrews v. CBOCS W., Inc.,* 743 F.3d 230, 234 (7th Cir. 2014)). "If the employer presents a legitimate reason, the burden shifts back to the

10

employee to show the proffered reason is a pretext for discrimination." *Vichio*, 88 F.4th at 691.

Here, plaintiff is proceeding under the *McDonnell Douglas* framework, though ultimately the question under both frameworks is the same: whether plaintiff has presented sufficient evidence to allow a reasonable jury to find that defendants engaged in sex, age, race or national origin discrimination. *Groves*, 51 F.4th at 769–70. Plaintiff has satisfied the first and third requirements of her prima facia case under *McDonnell Douglas*. Specifically, there is no dispute that plaintiff was a member of a protected class based on her age, sex, race and national origin. (Def.'s Resp. to PPFOF (dkt. #50) ¶ 1.) She is a white female of Scottish and Polish national origin. 42 U.S.C. §2000e-2 (prohibiting employment discrimination based on an individual's race, sex, or national origin).[6] At the time she was terminated, plaintiff was also approximately 53 years-old, satisfying the age requirement under the AEDA. *See* 29 U.S.C. § 631 (protecting persons over the age of 40 from age discrimination). Nor is there a dispute that her demotion and termination were adverse employment actions. *See Swanson v. Village of Flossmoor*, 794 F.3d 820, 825 (7th Cir. 2015) (demotions); *Castro v. DeVry University, Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) (terminations).

Even so, defendants do dispute plaintiff's proffered evidence as to the second and fourth requirements of plaintiff's prima facia case: (2) whether plaintiff was meeting her

---

[6] As recently construed, Title VII draws no distinctions between plaintiffs that are members of majority-groups or minority-groups. *Ames v. Ohio Dept. of Youth Servs.*, 605 U.S. 303, 309 (2025). Further, national origin and ancestry are considered synonymous for Title VII purposes. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973).

employer's legitimate expectations; and (4) whether she has identified a similarly situated employee who was not a member of her protected class and treated more favorably.  In determining the fourth factor, the court must consider whether plaintiff's proffered comparator meets the definition of "a similarly situated employee."  More specifically, the court is to look at all relevant factors to assess whether "the two employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000).

Here, plaintiff has identified Cadotte as a similarly situated employee who was not a member of her protected classes and received more favorable treatment, as he was appointed to replace plaintiff but was younger, male and Native American.[7]  In response, defendants contend that Cadotte is not a proper comparator because he was only appointed as an *interim* jail administrator, not as the jail administrator.   However, a "difference in job title alone is not dispositive" in a similarly situated employee inquiry.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007).  In this case, Cadotte was introduced to county staff as the "jail administrator," was paid as the jail administrator,

---

[7] Because plaintiff can establish a prima facia case by relying on Cadotte alone, the court need not address whether Jennifer Clapero would be a proper comparator as to at least some of the claims of discrimination.  *See Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011) ("Because the similarly situated analysis does not require numerosity, the plaintiff need offer evidence as to only one similarly situated comparator.")

12

had the same duties and responsibilities as plaintiff in managing the jail, had the same supervisors in Zupke and Grady, and likely would have been offered the permanent position if he had not resigned. In addition, a reasonable jury could conclude that Cadotte was treated more favorably. For example, defendants chose not to investigate Cadotte's role in the overdose at the jail, while defendants Grady and Zupke, as well as corporate counsel, created an ad hoc committee for the purpose of investigating plaintiff's response to an alleged sexual assault incident at the jail. Defendant Grady also told plaintiff to stop attending County Board meetings, specifically telling then-Sheriff Brennan to call off his "dog," while he almost immediately invited Cadotte to a PPLE meeting to introduce himself after hiring Cadotte to replace her.

The real dispute at summary judgment falls under the second prima facia factor: whether plaintiff was meeting her employer's legitimate expectations or whether defendants fired her for poor performance. Here, defendants proffer plaintiff's poor performance as a reason for termination. As a result, the court proceeds directly to the pretext step in the *McDonnell Douglas* framework. *Vichio*, 88 F.4th at 691. "In such a case, issues of satisfactory performance and pretext overlap." *Id.* (citation omitted). In determining whether plaintiff has shown pretext, plaintiff's proof "does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000).

In this case, genuine material factual disputes also exist as to whether plaintiff was meeting her employer's legitimate expectations and whether defendants' reason for firing

13

her was pretextual.  Specifically, a reasonable jury could accept defendants' explanation that plaintiff was demoted, then terminated because of her poor handling of the sexual assault complaint.  According to defendants, the sexual assault complaint was so significant, and plaintiff's handling of it so poor, that her actions demonstrated a failure of jail management.  They further argue that plaintiff demonstrated poor management by permitting inmates to cover their cell windows *and* overreacted to her demotion during her meeting with Zupke and Cadotte.

On the other hand, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that defendants' explanations do not hold up to scrutiny. A reasonable jury could believe that plaintiff was meeting her employer's legitimate expectations, having just recently received a letter of appreciation from Sheriff Brennan for her performance as jail administrator in December 2022 *and* having received no criticism from defendants regarding her management of the jail prior before termination.  Moreover, *none* of the explanations now offered by defendants as the basis for firing plaintiff were offered contemporaneously with her termination or demotion.  *See Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634–35 (7th Cir. 1996) (noting a reasonable jury could infer from the total absence of any initial justification for a job action that the later justification was concocted).  Nor did defendants take any action to address the alleged problems at the jail on their own.  With respect to the inmates covering the cell doors, which notably was not raised by defendants as a basis for plaintiff's termination until this lawsuit, the alleged incidents occurred while Zupke was chief deputy; and he admitted learning of the issue during his periodic jail visits.  (Def.'s Resp. to PFOF (dkt. #50) ¶

14

150.)  Nevertheless, Zupke took no action to remedy the issue or instruct plaintiff to do so despite his status as her immediate supervisor.  (*Id*.)

Similarly, a reasonable juror could find that defendants did not actually terminate plaintiff because of her handling of the sexual assault complaint.  With respect to the initial complaint, the potential victim was interviewed repeatedly by jail staff, but denied any sexual assault.  Moreover, the day after the inmate altered his story, plaintiff promptly notified Sheriff Brennan, asked outside agencies to investigate, and when unsuccessful, assigned the investigation to an Ashland County detective not associated with the jail.  After that investigation had begun, Sheriff Brennan also wrote plaintiff the letter of appreciation, and ultimately, the district attorney also found the sexual assault allegation to be unfounded.

As a result, defendants' primary critique of plaintiff's handling of the incident appears to boil down to her claimed failure to notify *Zupke* of the incident immediately.  However, even then, there is a genuine factual dispute about when plaintiff notified Zupke.  Plus, once again, neither Zupke, Grady nor Corporate Counsel Lindsey ever talked to plaintiff herself about this alleged failure, permitting a reasonable jury to conclude that defendants would have at least questioned her about her dealing with the alleged sexual assault *if* the failure were really so significant that it required firing plaintiff from the Sheriff's Department after her more-than 20-year tenure.

Finally, defendants argue that even if a jury *could* find that they lied about their real reasons for firing plaintiff, she still has not shown that her demotion or termination was motivated by race, sex, national origin or age.  However, a plaintiff is not required to show

"both pretext and some *additional* evidence of discrimination to permit the inference of unlawful intent." *Vichio*, 88 F.4th at 694–95. "[A]n employer's dishonest explanation of a decision can," by itself, "support an inference that its real reason was unlawful." *Id.* (quoting *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 932 (7th Cir. 2020)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding that a trier of fact may infer discrimination upon rejecting an employer's proffered reason for termination). Said another way, having concluded that a reasonable jury could find defendants' explanation for plaintiff's termination to be pretextual, they also *could*, but would not be required to, infer that her demotion and termination were motivated by her sex, race, national origin or age. Therefore, summary judgment must be denied to both sides on plaintiff's discrimination claims.

## II.    First Amendment Retaliation

Plaintiff also claims that defendants fired her because she engaged in protected speech while speaking at County Board and committee meetings on various topics related to the Sheriff's Office. To demonstrate a prima facie case of First Amendment retaliation, plaintiff must demonstrate that: (1) she engaged in speech protected under the First Amendment; (2) she suffered an adverse action that would likely deter future First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the defendant's decision to retaliate. *Santana v. Cook County Bd. of Review*, 679 F.3d 614, 622 (7th Cir. 2012) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). For a *public employee*'s speech to be protected under the First Amendment, however, the employee

must also show that:  (1) she made the speech as a private citizen; (2) the speech actually addressed a matter of "public concern"; and (3) her interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service.  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Swetlik v. Crawford*, 738 F.3d 818, 826 (7th Cir. 2013) (internal citation omitted).  Whether speech is protected is a legal question.  *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007).

Defendants concede that many of the issues raised by plaintiff in her reports to the County Board and its committees plainly involve public concerns.  (Def.'s Resp. to PPFOF (dkt. #50) ¶ 37.)  However, defendants argue that plaintiff was *not* speaking as a member of the public or as a private citizen in making comments at board meetings, but as an employee.  To determine whether a plaintiff spoke as a private citizen versus in the course of her duties as an employee, the court considers the content and context of her speech. *Kingman v. Frederickson*, 40 F.4th 597, 602 (7th Cir. 2022).  "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti*, 547 U.S. at 421; *see also Cage v. Harper*, 42 F.4th 734, 742 (7th Cir. 2022) ("The Supreme Court has held that the inquiry should be a 'practical one,' focusing on 'the duties an employee actually is expected to perform,' as opposed to strictly what is listed in his formal job description.").  In addition, a public employee is *not* speaking as a private citizen when her speech is "work product," composed during the course of her official duties or made at the direction of her government employer, *Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013), or when she is complaining

17

directly up the chain of command to her supervisors, *Olendzki v. Rossi*, 765 F.3d 742, (7th Cir. 2014).

The record on summary judgment presents a close question as to whether plaintiff spoke as a private citizen or public employee. Indeed, plaintiff herself bases her First Amendment claim on communications she made at numerous Board and committee meetings, which generally concerned the Sheriff's Office. Thus, the subject of plaintiff's comments was certainly related to her job as jail administrator. However, "the fact that plaintiff's statements certainly bore *some* relation to the subject matter of [her] job is not dispositive." *Cahoon v. School District of Flambeau*, 737 F. Supp. 3d 668, 679 (W.D. Wis. 2024); *Chrzanowski*, 725 F.3d at 738 ("Public employee speech does not lose First Amendment protection because it concerns the subject matter of the employee's job."). For plaintiff's speech to lack constitutional protection, it must constitute "'government employees' work product' that has been 'commissioned or created' by the employer." *Chrzanowski*, 725 F.3d at 738 (quoting *Garcetti*, 547 U.S. at 422).

According to plaintiff, she signed up for the public-comment portion of the meetings, on her own initiative, to talk about wage and staffing for county employees both within the jail and outside the jail, the latter falling outside her area of supervision. Her speech also occurred both during and after normal business hours. She further talked about Covid funds and errors she had identified in County Administrator Grady's county-wide budget that she determined on her own time via public records requests, some of which were unrelated to the jail's budget. Thus, even if plaintiff's speech was broadly related to her professional duties as jail administrator, the record contains no definitive evidence

18

suggesting that plaintiff's statements to the County Board were entirely "work product" that was "commissioned or created" by defendants, nor that she was speaking directly up the chain of command, which would have meant either the Chief Deputy or Sheriff. *Cf. Urban v. Brinkman*, No. 23-cv-01445, 2024 WL 3861108, at \*4 (E.D. Wis. Aug. 14, 2024) (public employee asking a town board supervisor for higher wages for themself and their colleagues was "going up the chain of command with a grievance")  To the contrary, the evidence is pretty strong that plaintiff was speaking in part on public policy matters that at least defendant Grady neither authorized nor agreed with his own views.

As discussed, in deciding whether a public employee's speech is protected under the First Amendment, the court must consider the "content, form, and context of the contested statement, as revealed by the whole record." *Kingman,* 40 F.4th at 602.  Thus, in *Kingman*, the Seventh Circuit stated that a public works director's decision to make a statement of no confidence in a colleague during "the public session of [a small town's] City Council's meeting, rather than privately . . . or in a closed session" was a fact indicating he spoke as a private citizen, *not* a public employee.  *Id*. at 602; *see also Cahoon*, 737 F. Supp. 3d at 680 (the fact that a school principal's speech to an officer was not at the school and outside of his employment hours weighed in favor of finding private speech).  So, too, here, plaintiff spoke during an open session of a small town's county board meeting to raise various matters of public concern, often outside of her regular hours at the jail.

Finally, defendants' own, repeated admonitions to plaintiff about her speech further support the conclusion that her speech was protected by the First Amendment.  In particular, once again, defendant Grady repeatedly told plaintiff to stop attending County

Board meetings, in part because he did not think it was part of her job.  As he stated at his deposition, he thought plaintiff should be focusing on managing the jail, not spending time at board meetings.  (Grady dep. (dkt. #32-1) 180 ("[S]he has a job to do. And being at a board meeting is not part of her job.").)  Similarly, after he was elected sheriff, defendant Zupke also instructed plaintiff to stop attending any board meetings; specifically, telling her that "Nobody [but him] can attend on duty nor speak on behalf of the sheriff's office." (Dkt. #44-10.)

Based on this record, the court concludes that at least some of plaintiff's speech was protected by the First Amendment.  Thus, plaintiff's First Amendment retaliation claim must be resolved by a jury, as she has presented sufficient evidence from which a reasonable jury *could* find that she was terminated at least in part for her protected speech that bothered both defendants Grady and Zupke as to her frequency of attendance and content of her speech at County Board and its committee meetings.  Accordingly, the parties' motions for summary judgment on plaintiff's First Amendment claim must also be denied.

## III.   Procedural Due Process Claim

This leaves plaintiff's due process claims.  Plaintiff states that she is bringing both procedural and substantive due process claims, but she may not proceed with a substantive due process claim.  A public official infringes the right to substantive due process by depriving someone of a "fundamental right or liberty" for "arbitrary and irrational" reasons that "shocks the conscience."  *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021).  However, "plaintiffs should resort to the substantive guarantees of the Due Process Clause

for relief only when there is not a particular Amendment that provides an explicit textual source of constitutional protection against a particular sort of government behavior." *Childress v. Walker*, 787 F.3d 433, 438–39 (7th Cir. 2015) (internal quotation marks omitted).

Here, plaintiff is already proceeding on constitutional claims under the Equal Protection Clause, First Amendment, and procedural due process, arising out of the same set of facts, so it would be inappropriate to apply substantiative due process to plaintiff's allegations, as well as unnecessarily confusing for a lay jury. *See Alexander v. McKinney*, 692 F.3d 553, 558 (7th Cir. 2012) ("[T]he Supreme Court has made it clear that a substantive due process claim may not be maintained where a specific constitutional provision protects the right at issue."); *Williams v. Snyder*, 150 F. App'x 549, 552-53 (7th Cir. 2005) (dismissing equal protection, access to courts, due process, and Eighth Amendment claims as duplicative of retaliation and freedom of religion claims).

Turning to plaintiff's procedural due process claim, plaintiff must show that: (1) she had a constitutionally protected property interest; (2) she suffered a loss of that interest amounting to a deprivation; and (3) she has at least some proof that deprivation occurring without due process of law. *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943–44 (7th Cir. 2010). In particular, when a public employee is fired, "the discharged employee must first establish that he or she had a property interest in continued employment. To determine whether such a property interest exists, we must turn to state law." *Schultz v. Baumgart*, 738 F.2d 231, 234 (7th Cir. 1984). Under Wisconsin law, non-probationary law enforcement officers have a protected property interests in their jobs.

21

*Doubet v. Eckelberg*, 81 Fed. Appx. 596, 601 (7th Cir. 2003) (citing *Larson v. City of Tomah*, 193 Wis. 2d 225, 532 N.W.2d 726 (Wis. 1995); *Schultz v. Baumgart*, 738 F.2d 231, 234–35 (7th Cir. 1984).)  As to whether plaintiff has shown that she was "discharged without the procedural protections accorded by the due process clause," *Schultz*, 738 F.3d at 235, those protections include: notice of the proposed deprivation; a statement of reasons; and an opportunity to be heard in response.  *Bradley v. Vill. of Univ. Park, Illinois*, 929 F.3d 875, 882 (7th Cir. 2019).  "Also, the chosen decisionmaker must be impartial." *Head v. Chicago Sch. Reform Bd. of Trs.*, 225 F.3d 794, 804 (7th Cir. 2000).  Plaintiff's evidence raises a genuine factual dispute about whether the decisionmakers (the County Board) were impartial, or whether they were unfairly influenced by defendant Grady's actions before and during plaintiff's appeal hearing.  More specifically, plaintiff submitted evidence that although the Board initially voted in favor of plaintiff keeping her job, Grady then requested a recess, talked to board members privately, and convinced at least one of them to change their vote.  Although Grady denies that he influenced the outcome (Grady dep. (dkt. #32-1) 213–14), a reasonable jury could conclude otherwise and find that plaintiff was deprived of a fair hearing.  Accordingly, plaintiff's procedural due process claim will also be allowed to proceed to trial.

ORDER

IT IS ORDERED that:

1. Plaintiff's motion for leave to file an amended complaint (dkt. #28) is GRANTED.

2. Plaintiff's motion for summary judgment (dkt. #36) is DENIED.

3. Defendant's motion for summary judgment (dkt. #38) is DENIED.

Entered this 13th day of July, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge